Judgment rendered November 17, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,150-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

ORLANDUS BATHDOMUS                          Appellant
MARCELIUS PRUDE

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 350647

Honorable Katherine Clark Dorroh, Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Holli Ann Herrle-Castillo

JAMES E. STEWART                       Counsel for Appellee
District Attorney

TOMMY JAN JOHNSON
EDWIN L. BLEWER, III
Assistant District Attorneys

* * * * *

Before STONE, COX, and ROBINSON, JJ.

**ROBINSON, J.**

The defendant, Orlandus Bathdomus Marcelius Prude ("Prude"), was originally convicted of aggravated burglary and simple robbery and sentenced to 15 years at hard labor and 5 years at hard labor, respectively, to be served concurrently and without benefit of probation, parole, or suspension of sentence. Following his adjudication as a second-felony offender, the original aggravated burglary sentence of 15 years was vacated and Prude was sentenced to 30 years at hard labor and the simple robbery sentence remained the same, to be served concurrently, and without benefit of probation, parole, or suspension of sentence.

Prude appealed the convictions and sentences. This Court affirmed the conviction and sentence for simple robbery, but reversed the conviction and sentence for aggravated burglary, entered a responsive verdict of unauthorized entry of an inhabited dwelling, and remanded for resentencing.

Prude was resentenced as a second-felony offender to 10 years at hard labor for the conviction of unauthorized entry of an inhabited dwelling, concurrent with the sentence of 5 years for simple robbery, with credit for time served. Prude filed a motion to reconsider the sentence, claiming the sentence was excessive, which was denied. Defendant appeals the denial of the motion to reconsider sentence.

We AFFIRM the trial court's sentence of 10 years for the unauthorized entry of an inhabited dwelling conviction, which is to be served concurrent with the sentence of 5 years for the simple robbery conviction, with credit for time served.

## FACTS AND PROCEDURAL HISTORY

The background in this matter was set forth in detail in this Court's

earlier opinion in *State v. Prude*, 53,193, pp. 1-4 (La. App. 2 Cir. 3/4/20),

293 So. 3d 183,184-8:

> Sometime after 10:00 p.m. on June 22, 2017, officers of the Caddo Parish Sheriff's Office ("CPSO") responded to a 911 call regarding a claim of a home invasion at 3145 Edson Street in Shreveport. The homeowner, Christina Taylor, informed the officers that her ex-boyfriend, Orlandus Prude, suddenly appeared in her bedroom and attacked her and her friend, Jataurus Jamison. According to Taylor, Prude then took their cell phones, grabbed a liquor bottle he found in her house, and smashed a window of Jamison's vehicle with it before driving away.
>
> Ultimately, Prude was arrested and charged with aggravated burglary, in violation of La. R.S. 14:60, and simple robbery, in violation of La. R.S. 14:65. A jury trial in this matter began October 23, 2018, with the presentation of the following testimony and evidence.
>
> Christina Taylor, one of Prude's victims, was the first to testify. She and Prude met in high school, dated on and off for a number of years, and had a seven-year-old son together. Prude lived with her and their son at the Edson Street house for a few months from late 2016 to February 2017, when Taylor demanded he move out. However, Prude still came to her house to watch their son while she worked. About two weeks before the June 22, 2017, incident, Taylor and Prude broke up and she began seeing Jamison.
>
> On June 22, 2017, Taylor had a flat tire and called Prude looking for the spare tire for her pickup truck. When she got no response, she called Prude's mother and then his sister, looking for Prude and the spare tire and was told the tire might be at his mother's house across town. Taylor then decided to simply buy a tire. Taylor's uncle and Jamison came to help, and ultimately Taylor's father put the new tire on the truck. Taylor then "went to [Prude's] mama's house and then home." Taylor did not elaborate as to why she went to Prude's mother's house, or what she did there; she was not asked to explain.
>
> Taylor testified that when Prude later returned her call, she told him she had only been looking for her spare tire and he was no longer needed. Taylor refused Prude's request to come over to Taylor's house to see their son. Taylor told him they did fine

2

without him, hung up, and did not answer when Prude called again.

That night, Jamison arrived at Taylor's house between 9:00 and 9:30 p.m. Taylor's son was asleep on the couch; she took a shower. Taylor and Jamison had been in the bedroom a short time when they heard a knock, followed by the sound of a door coming down. Taylor approached the bedroom door and asked, "Who is it?" A man answered "It's me," and Taylor testified she recognized Prude's voice. As Prude pushed the bedroom door open, she pushed it back. Prude pushed the door again, entered the bedroom, and Taylor stated he began repeatedly hitting her in the face with his fist. To escape Prude's blows, Taylor described ducking into the bedroom closet, at which point Prude turned and began punching Jamison in the head. Taylor came out and tried to stop Prude, who began to hit her again. Taylor testified she informed Prude of her intention to call the police, and Prude took Taylor's cell phone from her hand and crushed it. According to Taylor, Prude also took Jamison's cell phone, recalling Prude placed it in his pocket. She then saw another man she knew as Eric Pitts, standing in the hallway. Taylor said Prude told Pitts to "go get the gun" but she never saw Pitts get one.

As Prude left the house, he grabbed an empty liquor bottle Taylor had left by her front door; Prude used the bottle to smash Jamison's car window. Prude and Pitts drove away, and Jamison followed in his vehicle. Taylor stated Jamison returned about 30-45 minutes later.

Taylor called 911 from a neighbor's house. She suffered a black eye, a busted nose, and a busted lip, and she later noticed blood coming from her ear. She was treated by paramedics and released.

Taylor testified that after the incident she believed Prude had taken her wallet because she could not find it. Taylor testified that when she was in the closet, Prude was going through her bag, and said to "give it up, give me everything you got." Taylor described how they tussled over the purse a little bit, leading to her belief he had taken it. However, she found her wallet under the bed the next day. Thus, Taylor testified nothing other than the two phones and the liquor bottle were taken from her home.

According to Taylor, her "rickety" front door had a working deadbolt but was only held up by a nail at the top, and Prude "maybe could have just pushed it hard, but I would say he kicked it in, okay, because that's how it sounded." Taylor testified all she could hear was the door tearing down and she was frightened. Taylor testified there was damage to the front door frame where the hinges attached, and the frame had to be replaced.

3

Jataurus Jamison also testified at trial, and his testimony largely supported Taylor's. According to Jamison, he had met Taylor only about two weeks before the incident. Jamison described Taylor's front door as not being secured to the frame; it had to be locked to keep it closed. When Jamison arrived at Taylor's residence, her son was asleep on the couch, and Jamison went straight to Taylor's bedroom, while Taylor took a shower. About 20-30 minutes later, Jamison testified Taylor had finished her shower and was drying off with a towel when they heard a noise. The bedroom door began opening, and Taylor pushed it closed. The door opened again and Taylor flew backward as a man burst into the room. Jamison described the man hitting Taylor in the face with his closed fist, multiple times, then turn and begin hitting Jamison in the head. According to Jamison, the man took Taylor's and Jamison's cell phones. Another man stood in the hallway. Jamison did not know either one of the intruders.

After the intruders left, Jamison dressed and went outside to find that one of the windows of his vehicle was smashed. An empty tequila bottle that had been in Taylor's house was now in the backseat. Jamison drove to his cousin's house to use the phone, because Prude had taken his. He threw the empty bottle in a dumpster. Jamison recalled returning to Taylor's house 20-30 minutes later.

According to Jamison, as a result of Prude's attack he suffered two "bumps" on his forehead and one behind his ear. Jamison was treated by paramedics and released, although he continued to experience lightheadedness while at work for a week or two after the incident. Jamison did not hear anyone mention a gun during the incident.

Corporal Dennis Williams and Detective Matthew Lucky, of the CPSO, testified that Taylor's nose was swollen, Jamison had a knot on his forehead, and both had some blood on them and appeared shaken. Taylor's son was asleep on the couch when officers arrived—apparently, he slept through the entire incident.

Corporal Williams testified the front door of the home had been removed from the hinges. Further inspection of the door indicated it did not appear to have been on the hinges for a while. Corporal Williams thought the door appeared to have been "thrown," and noticed there was some damage, of an indeterminate age, to the strike plate at the bottom of the door. The rear driver's side window of a vehicle parked in the driveway was shattered and its interior was covered in glass. Corporal Williams also observed that the bedroom was in disarray, and it appeared that there had been a struggle.

The officers confirmed at trial Jamison told them he disposed of a liquor bottle he found in the back seat of his vehicle into a

dumpster by an apartment building off Grimmet Drive, about 8-10 miles away from Taylor's residence. The officers also confirmed Taylor told them the bottle came from her house. Officers were able to retrieve a bottle matching the description that Taylor and Jamison gave them from the dumpster.

Detective Lucky testified that Prude and Pitts were identified as the intruders. Pitts was located and interviewed on June 28, 2017, and Prude was located and interviewed on July 5, 2017. Detective Lucky testified that in his interview, Prude indicated he had previously been living with Taylor, off and on, but was not living there at the time of the incident. Prude initially told Det. Lucky he entered Taylor's home using a key, but later stated he lifted the door up and pushed it in. The state questioned Det. Lucky about Prude's knowledge of who was in the house.

> State: Did the defendant, during your interview with him, indicate that he knew that there was someone else at Ms. Taylor's residence?

> Det. Lucky: There would have been a point that he knew that there was somebody at that residence. There was another vehicle in that yard that did not belong to Ms. Christina.

> State: During your interview with the defendant, did he indicate what his state of mind was when he entered Ms. Taylor's residence?

> Det. Lucky: The only thing that he told me as far as going over to Ms. Christina's residence, that he was going over there to get a tire, that he was wanting a tire from a vehicle – from previous conversation between him and her earlier on about her having a flat tire, pulling into that address and seeing another vehicle there. Like stated, he forced his way into the house originally saying that he was going there for a tire, but when he made it to the back bedroom, I mean, a fight transpired between them.

> Prosecutor: Did he indicate that he was angry?

> Det. Lucky: Did not indicate . . . that he was angry.

Prude initially told Det. Lucky no one was with him when he entered the house, but later admitted that Pitts rode with Prude to Taylor's house. Detective Lucky testified that Prude admitted to striking both Taylor and Jamison, taking and smashing their cell phones and using the liquor bottle he found in Taylor's house to smash Jamison's vehicle window.

5

Prude's audio-recorded interview was introduced into evidence and played for the jury. In that interview, Prude informed Det. Lucky that Taylor called him about a flat tire and she got his spare tire from his mother's house. Prude stated that when he arrived at Taylor's house, he saw a vehicle that did not belong to Taylor and so he knew someone else was at her house. Prude stated he found Taylor in the bedroom with another man and he hit them both. Prude admitted he got upset when he saw Taylor with someone because he thought they were supposed to be working on their relationship. According to Prude, Taylor told him that she was not "messing around with anyone." Prude admitted he took their cell phones from the bedroom dresser and broke them on the ground. Then he took a liquor bottle from inside the house and used it to smash the window of the car outside.

Detective Lucky testified that, based upon his interviews with Taylor and Jamison, he prepared and obtained two warrants for Prude's arrest—one for aggravated burglary and one for simple robbery. In the affidavits to support the arrest warrants, Det. Lucky stated, "Christina advised Orlandus told her to give him everything she has, and he took her purse, wallet, and two cell phones." Detective Lucky testified prior to his interviews with Pitts and Prude, he contacted Taylor a second time, and she never mentioned the purse or wallet. During the officer's interview with Prude, Det. Lucky was still under the impression those items had been taken, and, to his knowledge at trial, that property had never been located. Detective Lucky testified Taylor never contacted him to advise she had located those items.

John Anderson, a crime scene investigator for CPSO, testified that the front door was off its hinges and leaning against the doorframe. Officer Anderson identified in court the photographs he took at the scene. Several photos related to Prude's entry into Taylor's house and the condition of the front door as a result. Other photos were of the liquor bottle and/or Jamison's vehicle. Finally, other photos reflected the condition of the victims and the room where they were attacked. Additionally, Ofc. Anderson testified no viable fingerprints were obtained from the liquor bottle recovered from the dumpster. The bottle matched the description of the bottle Taylor and Jamison said was at Taylor's home and Jamison said he found in his back seat and deposited in the dumpster.

Lee Scott, an investigator with the Caddo Parish District Attorney's Office, testified he served a subpoena on Pitts to appear and testify in court, but Pitts failed to appear during the trial. The state rested. After the trial court reviewed Prude's right to testify and remain silent, Prude exercised his right to remain silent. The defense rested.

The jury found Prude guilty as charged on both counts. He subsequently filed a motion for post-verdict judgment of acquittal and appeared for argument on his motion, which was denied by the trial court. Prude waived all sentencing delays, and the trial court proceeded with the sentencing hearing. After the hearing, the trial court sentenced Prude to serve 15 years at hard labor for the aggravated burglary conviction and 5 years at hard labor for the simple robbery conviction. The trial court ordered that the sentences run concurrently and that the minutes reflect that both offenses were designated as crimes of violence. Prude was given credit for time served. Prude was also ordered to pay court costs and $50.00 to the Indigent Defender Board. On November 18, 2018, Prude filed a motion to reconsider sentence, which was ultimately denied.

On February 28, 2019, the state charged Prude as a second-felony habitual offender.[1] After considering evidence at the habitual offender hearing, the trial court determined the state had proved beyond a reasonable doubt that Prude was a second-felony habitual offender, and Prude appeared for resentencing on May 1, 2019. The trial court noted the applicable sentencing range and reminded Prude of the time delays to file a motion to reconsider sentence, a motion for appeal, and for post-conviction relief. The trial court also noted it adopted the aggravating and mitigating considerations previously articulated for sentencing. Prude's original sentence was vacated, and he was resentenced to serve 30 years at hard labor, without benefit of probation, parole, or suspension of sentence. The trial court ordered the sentence to run concurrent with Prude's sentence for simple robbery.

Prude filed a timely motion to appeal his convictions and sentences, which was granted.[2] This appeal ensued.

In its March 4, 2020, opinion, this Court affirmed the trial court's conviction and sentence for simple robbery, but reversed the conviction and sentence for aggravated burglary. It entered the responsive verdict of unauthorized entry of an inhabited dwelling, rendered a judgment convicting

---

[1] The bill asserted that Prude had a prior conviction in which he pled guilty, on December 19, 2013, to simple robbery in the First Judicial District Court, Caddo Parish, in Docket No. 317,311. Prude was sentenced to serve three years at hard labor.

[2] Louisiana C. Cr. P. art. 914 allows a motion for appeal to be filed within 30 days of the judgment *or* ruling on a motion to reconsider sentence. Prude's motion for appeal was filed on May 1, 2019, within 30 days of the trial court's ruling on his motion to reconsider sentence, which was on May 9, 2019.

Prude of that offense, and remanded the matter for sentencing. Prude was resentenced as a second-felony offender to 10 years at hard labor for the conviction of unauthorized entry of an inhabited dwelling, concurrent with the sentence of 5 years for simple robbery, with credit for time served.

**DISCUSSION**

Prude argues that the 10-year sentence he received for his conviction of unauthorized entry of an inhabited dwelling is excessive. He further claims that the trial court failed to consider any mitigating factors as set forth in La. C. Cr. P. art. 894.1.

There is a two-prong test to be used by the appellate court when reviewing an excessive sentence claim: (1) the trial record must demonstrate that the trial court complied with the guidelines in La. C. Cr. P. art. 894.1 (list of sentencing factors); and (2) the appellate court must determine if the sentence is constitutionally excessive. *State v. Ladd*, 14-1611 (La. 3/27/15), 164 So. 3d 184 (*per curiam*).

Prude claims that the trial court did not consider any of the mitigating factors of the case and argues that the following factors listed in La. C. Cr. P. art. 894.1 B(22) through B(33) should be applicable:

(a) The defendant's criminal conduct neither caused nor threatened serious harm.
(b) The defendant did not contemplate that his criminal conduct would cause or threaten serious harm.
(c) The defendant acted under strong provocation.
(d) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense.
(e) The victim of the defendant's criminal conduct induced or facilitated its commission.
(f) The defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained.
(g) The defendant has led a law-abiding life for a substantial period of time before the commission of the instant crime.
(h) The defendant's criminal conduct was the result of circumstances unlikely to recur.

8

(i) The defendant is particularly likely to respond affirmatively to probationary treatment.
(j) The imprisonment of the defendant would entail excessive hardship to himself or his dependents. (R.69-70).

The trial court judge specifically stated in its sentencing order that it "does not find any of the mitigating circumstances to be applicable listed in B(22) to (33)." The court did not fail to consider such factors, but it merely found that they are inapplicable to the case. Instead, the court elaborated on several of the aggravating circumstances enumerated in La. C. Cr. P. art. 894.1 B(1) through (21), specifically:

> B(1): The offender's conduct during the commission of the offense manifested deliberate cruelty to the victim because the two victims were struck by punches inflicted by Appellant in the presence of a child;
> B(5): The offender knowingly created a risk of death or great bodily harm to more than one person;
> B(6): The offender used threats of or actual violence in the commission of the offense; and
> B(11): The offense involved multiple victims for which separate sentences have not been imposed.

It further stated that all factors of La. C. Cr. P. art. 894.1A apply, which provides that:

> When a defendant has been convicted of a felony or misdemeanor, the court should impose a sentence of imprisonment if any of the following occurs:
> (1) There is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime.
> (2) The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution.
> (3) A lesser sentence would deprecate the seriousness of the defendant's crime.

The State argues that the facts do not support a finding of any of the mitigating circumstances proposed by defendant and addresses each individually in its brief. It essentially argues that Prude's unjustified conduct of striking Taylor and Jamison multiple times was such to establish

9

crimes of violence, supporting the sentence imposed by the trial court. The State adds that there is a heightened seriousness of the crime because it involves an invasion of the sanctity of one's home. It also emphasizes Prude's previous felonies, mentioning that the trial court referred to Prude's rap sheet. It is the State's position that Prude had a history of criminal acts and would likely be a repeat offender if not adequately punished.

Articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. *State v. Duncan*, 53,194 (La. App. 2 Cir. 1/15/20), 290 So. 3d 251. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332. Important elements to be considered are defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. DeBerry*, *supra*. There is no requirement that specific matters be given particular weight at sentencing. *State v. DeBerry*, *supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

Although the trial court did not elaborate on each specific mitigating factor argued by the defense, it did reference its consideration thereof. It instead focused on certain aggravating factors when imposing defendant's sentence. In its original ruling and sentencing, the court explained its reasoning as it applied to the facts of the case, and specifically discussed the

10

aggravating factors for sentencing. In the multiple offender sentencing, the trial court filed written reasons, referencing Prude's criminal history involving violence, the fact that he had previously been sentenced to hard labor only to repeat criminal conduct following release, that he showed no intent to stop criminal activity, and that he was in need of correctional treatment. The trial court adopted by reference and incorporated all of the reasons stated for the original sentencing and subsequent habitual offender sentencing in its resentencing.

Prude also argues that although the sentence is within the allowed range and not the maximum, it is nevertheless constitutionally excessive since it is disproportionate to the crime and shocks one's sense of justice.

A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980); *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17), 244 So. 3d 764. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. DeBerry*, *supra*; *State v. Modisette*, 50,846 (La. App. 2 Cir. 9/28/16), 207 So. 3d 1108.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Allen*, *supra*.

Pursuant to La. R.S. 14:62.3, the sentencing range for unauthorized entry of an inhabited dwelling is 0 to 6 years. Because Prude was found to be a second felony offender, La. R.S. 15:529.1 mandated an increased sentencing range of 2 to 12 years. The trial court imposed a sentence of 10 years, below the range maximum. Pursuant to La. R.S. 15:529.1(G), the sentence is without benefit of probation or suspension of sentence, but with eligibility for parole.

The State asserts that the sentence imposed by the trial court was within its discretion, and that it was just, does not shock the sense of justice, and is not a needless and purposeless infliction of pain upon the appellant. We agree.

Prude's sentence is not constitutionally excessive and is well-supported by the record. The trial judge did not abuse her discretion by imposing a 10-year sentence for Prude's conviction of unauthorized entry of an inhabited dwelling, which is less than the maximum allowed sentence for a second felony offender. In addition, as a result of this Court's reversal of the aggravated burglary conviction and entering of the lesser responsive verdict of unauthorized entry of an inhabited dwelling, the trial court's resentencing is with benefit of parole. As previously stated, the trial court adequately considered the facts of the case presented at trial, Prude's criminal history, and the seriousness of the offense. The trial court further found that imprisonment was necessary, elaborated on the aggravating factors, and stated that there were no mitigating factors given the facts of the case, all of which served as justification for an enhanced sentence.

## CONCLUSION

For the foregoing reasons, this Court AFFIRMS the defendant's sentence of 10 years for his conviction of unauthorized entry of an inhabited dwelling, which is to be served concurrent with the defendant's sentence of 5 years for his conviction of simple robbery, with credit for time served.

**AFFIRMED.**